UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH DAKOTA
SOUTHERN DIVISION

| | |
|---|---|
| FLANDREAU SANTEE SIOUX TRIBE, a federally recognized Indian tribe,<br><br>              Plaintiff,<br><br>vs.<br><br>UNITED STATES OF AMERICA; ALEX M. AZAR II, in his official capacity as Secretary of the United States Department of Health and Human Service; RADM MICHAEL D. WEAHKEE, in his official capacity as Director of the Indian Health Service; and DAVID BERNHART in his official capacity as Secretary of the United States Department of Interior,<br><br>              Defendants. | **4:20-CV-4142**<br><br><br>**MEMORANDUM OPINION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO DISMISS** |

Plaintiff Flandreau Santee Sioux Tribe ("the Tribe") has filed a lawsuit against Defendants United States of America; Alex M. Azar II, in his official capacity as Secretary of the United States Department of Health and Human Service; Radm Michael D. Weahkee, in his official capacity as Director of the Indian Health Service; and David Bernhart in his official capacity as Secretary of the United States Department of Interior (collectively, "Defendants"). In its Complaint, the Tribe alleges that Defendants failed to pay the full amount of contract support costs due to it in violation of their obligations under the Tribe's Indian Self Determination Education and Assistance Act ("ISDEAA") contracts for fiscal years 2011 through 2013 and in violation of the ISDEAA. Pending before the Court is Defendants' Motion to Dismiss Counts II, III, and VI of the Tribe's Complaint pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure for lack of subject matter jurisdiction. For the following reasons, Defendants' Motion to Dismiss Counts II and III is granted and is granted in part and denied in part as to Count VI as set forth in the Court's Order.

## BACKGROUND

### A. ISDEAA and Contract Support Costs

1

The Indian Self-Determination and Education Assistance Act ("ISDEAA"), Pub. L. No. 93-638, as amended, 25 U.S.C. § 5301 *et seq.*, authorizes the government and Indian tribes to enter into contract in which the tribes promise to supply federally funded services, for example tribal health services, that a Government agency would otherwise provide. (Doc. 1, ¶¶ 16-17); *Cherokee Nation of Okla. v. Leavitt*, 543 U.S. 631, 634 (2005) (citing § 450f(a)). 25 U.S.C. § 5325(a)(1) provides for direct program funding, sometimes referred to as the "Secretarial amount," representing the amount the Secretary "would have otherwise provided for the operation of the programs." (Doc. 1, ¶ 18). Added to the Secretarial amount are "contract support costs" ("CSC") which "consist of an amount for the reasonable costs for activities which must be carried on by a tribal organization as a contractor to ensure compliance with the terms of the contract and prudent management . . . ." (Doc. 1, ¶ 19) (citing 25 U.S.C. § 5325(a)(2)).

Contract support costs are mostly "administrative expenses." (Doc. 1, ¶ 20) (citing *Cherokee Nation*, 543 U.S. at 634-35). They are generally categorized as "indirect" contract support costs which are overhead costs applicable to more than one program, and "direct" contract support costs, which are those that benefit one particular program ("such as workers' compensation insurance"). (Doc. 1, ¶ 20) (citing *Cherokee Nation*, 543 U.S. at 635). The ISDEAA obligates IHS to pay "reasonable and allowable costs" of "direct program expenses" plus "any additional administrative or other expense incurred by the governing body of the Indian Tribe . . . and any overhead expense incurred by the tribal contractor in connection with the operation of the Federal program. . ." provided that the contract support cost payment does not duplicate an amount paid in the Secretarial amount. (*See* Doc. 1, ¶ 21); 25 U.S.C. § 5325(a)(3)(ii).[1]

---

[1]     ISDEAA defines contract support costs as:

The contract support costs that are eligible costs for the purposes of receiving funding under this subchapter shall include the costs of reimbursing each tribal contractor for reasonable and allowable costs of—

(i)     direct program expenses for the operation of the Federal program that is the subject of the contract, and

(ii)    any additional administrative or other expense incurred by the governing body of the Indian Tribe or Tribal organization and any overhead expense incurred by the tribal contractor in connection with the operation of the Federal program, function, service, or activity pursuant to the contract,

except that such funding shall not duplicate any funding provided under subsection (a)(1) of this section.

25 U.S.C. § 5325(a)(3)(A).

Indirect contract support costs are typically calculated by reference to an indirect cost rate. (Doc. 1, ¶ 27).   An indirect cost rate is a common accounting tool that recipients of federal funds employ to allocate administrative and overhead costs across multiple programs supported by pooled administrative activities (Doc. 1, ¶ 27).   Such pooled activities typically include financial management and accounting systems, information technology systems, insurance, facilities, procurement activities, and personnel management systems." (Doc. 1, ¶ 27).   An indirect cost rate is calculated by pooling these administrative costs into an "indirect cost pool," and then dividing that pool by the total amount of direct program costs that are supported, served, or benefited by the pool.   (Doc. 1, ¶ 28).   This calculation results in a rate known as an indirect cost rate, which is then applied to a direct cost base of each program supported by the pool.   (Doc. 1, ¶ 28).   The direct cost base is comprised of the funds spent under the IHS contract and includes programs "received or initiated by the [Tribe] subsequent to the negotiation of the [indirect cost rate] . . . if the program received administrative support from the indirect cost pool." (Doc. 1, ¶ 29) (citing 2011 Indirect Cost Negotiation Agreement at II(J)(2)).   This method permits a contractor to allocate its pooled indirect costs to each of the supported programs based on the one indirect cost rate.   (Doc. 1, ¶ 29).

**B. Tribe's ISDEAA Agreements**

From fiscal years 2011 through 2013, the Tribe operated various Indian Health Service ("IHS") health care programs, functions, services, and activities within its jurisdictional area to eligible Indians and other eligible beneficiaries pursuant to its Self-Determination Contracts authorized by Title I of the ISDEAA.   (Doc. 1, ¶ 10).   From October 1, 2010 to September 30, 2013, the Tribe operated federal IHS programs pursuant to Contract No. HHS-I-241-2011-00004 as modified, and funding agreements awarded pursuant to the contract.   (Doc. 1, ¶ 10).   Funding agreements for Title I funds are issued annually and are often amended throughout the year to take account of new funds made available to the Tribe.   (Doc. 1, ¶ 14).   The Tribe's funding agreements are fully incorporated into its contracts.   (Doc. 1, ¶ 14).   The health services provided by the Tribe during the years at issue include hospitals and clinics, dental, mental health and social services, an alcohol and substance abuse program, community health representatives and services, contract health services, public health nursing, and general health and human services.   (Doc. 1, ¶ 11).

When IHS runs a health care program, it bills Medicare, Medicaid, and private insurance programs, collects revenues from those programs, and then uses those revenues to operate additional and larger programs. (Doc. 1, ¶ 30). Revenue from these programs is generally called "third-party revenue," and the generation and expenditure of these revenues is alleged to be an integral part of IHS operations. (Doc. 1, ¶ 30). It is alleged that IHS's comprehensive health care programs include, and are funded by, both appropriated funds and third-party revenues. (Doc. 1, ¶ 30).

## C. Procedural History

On September 27, 2017, the Tribe submitted a claim letter for "the right to immediate payment of $278,739.00 plus interest, arising out of the Indian Health Services' failure to pay Claimant's full contract support costs ("CSC"), as otherwise required by the [ISDEAA], other applicable federal law, and the provisions of the contracts and funding agreements, as amended, in effect between the parties for fiscal year 2011." (Doc. 1-3). In that claim letter, the Tribe detailed its calculation of the 2011 claim amount as follows: 1) failure to pay/underpayment of indirect support costs in the amount of $242,255; 2) claim for $34,042 for the wrongful carryforward adjustments (average effect on IDC Rate of tribal wrongful carryforward adjustments for second cycle of double dipping (.89%) and restoration of shortfall dollars in carryforward template (.78%) x direct costs; 3) failure to pay direct contract support costs in the amount of $1,705; 4) failure to pay indirect costs on direct contract support costs in the amount of $737; 5) expectancy and other damages in the amount of $0. (Doc. 1-3). The Tribe's fiscal year 2011 CDA claim stated that "IHS failed to meet its contractual and statutory obligations by failing to pay the full amount of Claimant's contract support cost requirement calculated pursuant to IHS's policies, and by applying an unlawful policy limiting the total amount that would be paid to Claimant." (Doc. 1-3).

The Tribe's November 3, 2017, CDA claims letter claimed the right to "payment of $900,869.00 plus interest, arising out of the Indian Health Services' failure to pay Claimant's full contract support costs ("CSC"), as otherwise required by the [ISDEAA], other applicable federal law, and the provisions of the contracts and funding agreements, as amended, in effect between the parties for fiscal years 2012 and 2013." (Doc. 1-3). Both the September and November 2017 claim letters wer signed and certified by Tribal President, Anthony Reider and addressed to the

4

Acting Director of Indian Health Service and the Acting Chief of the Contracting Office in Aberdeen, South Dakota. (Doc. 1-3). The letter stated that the claim amount was calculated pursuant to the Tribe's Contract Dispute Calculation and Information forms, copies of which were attached to the letter, and which were incorporated therein by reference. (Doc. 1-3).

The Tribe's Contract Dispute Calculation and Information form for fiscal year 2012 was for $305,694 and included the following claims: 1) claim 1 – underpayment of NBC awarded rate (shortfall claim) in the amount of $305,694; 2) claim 2 in the amount of "$–" for rate making error – inclusion of non paying agencies in base; 3) claim 3 in the amount of "$–" for wrongful carryforward adjustments second cycle of double dipping; 4) claim 4 in the amount of "$–" for wrongful carryforward adjustments, restore shortfall dollars in carryforward template; 5) claim 5 – failure to pay direct contract support costs in the amount of "$–"; 6) claim 6 – failure to pay indirect support costs on unpaid direct contract support costs in the amount of "$– "; 7) claim 7 – expectancy damages in the amount of "$–"which included the "amount of unpaid direct contract support costs and indirect costs paid from direct cost funding that should have been available for additional program services" and the "amount of third party revenues that would have generated from the unpaid direct contract support costs and indirect costs paid from direct cost funding based upon the % of third party revenues compared to the direct cost award. (% multiplied by $ = amount of expectancy claim.). (Doc. 17-1). The Tribe's Contract Dispute Calculation and Information form for fiscal year 2013 was for $595,175 and included the following claims: 1) claim 1 – underpayment of NBC awarded rate (shortfall claim) in the amount of $595,175; 2) claim 2 in the amount of "$–" for rate making error – inclusion of non paying agencies in base; 3) claim 3 in the amount of "$–" for wrongful carryforward adjustments second cycle of double dipping; 4) claim 4 in the amount of "$–" for wrongful carryforward adjustments, restore shortfall dollars in carryforward template; 5) claim 5 in the amount of "$–" for failure to pay direct contract support costs; 6) claim 6 in the amount of "$–" for failure to pay indirect support costs on unpaid direct contract support costs; 7) claim 7 in the amount of "$–" for expectancy damages which included the "amount of unpaid direct contract support costs and indirect costs paid from direct cost funding that should have been available for additional program services" and the "amount of third party revenues that would have generated from the unpaid direct contract support costs and indirect costs paid from direct cost funding based upon the % of third party revenues compared to the direct cost award. (% multiplied by $ = amount of expectancy claim.)." (Doc. 17-1).

The Tribe's Dispute Calculation and Information form for fiscal years 2012-13 was also shared with Jamie Whitelock, an attorney from the Office of General Counsel with the Department of Health and Human Services who Indian Health Service authorized to respond to and resolve through possible settlement, the Tribe's claims. (Doc. 31-2 at 307). On June 25, 2018, Ms. Whitelock responded by letter to the Tribe's claims (Doc. 31-2 at 307-311). On October 19, 2018, counsel for the Tribe responded by letter labeled "Rule 408 Privileged Communication" in which it stated, among other things, that funding from third party revenues which were used to provide services under the funding agreements, amounted "to an increase in the direct cost base of $1,013,079, $635,269, and $874,248 for fiscal years 2011 through 2013, respectively." (Doc. 31-2 at 312). The Tribe stated that this third-party funding adds: (1) $841,226 in total to the Tribe's Claim 1 – Underpayment of NBC Awarded Rate (Shortfall Claim) ($319,323 in FY 11; $210,147 in FY 12; and $311,757 in FY 13); (2) $21,559 total to Claim 5 – Failure to Pay Direct Contract Support Costs ($8,658 in FY 11; $5,429 in FY 12; $7,472 in FY 13); (3) and $7,205 total to Claim 6 – Failure to Pay Indirect Costs on Unpaid Direct Contract Support Costs. The Tribe also noted that after further analysis, its Claim 1 for fiscal year 2012 was decreased by $27,287 to $278,407. The Tribe concluded its October 19, 2018, letter by offering to the settle its claims for a designated amount.

On December 26, 2018, responding by letter to the Tribe's October 19, 2018, settlement proposal, Ms. Whitelock stated that the Tribe's "new claims for third-party funding based on *Navajo Health Foundation—Sage Memorial Hospital, Inc. v. Burwell*, 263 F.Supp.3d 1083 (D.N.M. Nov. 3, 2016) (*Sage*)" had not been presented to Indian Health Services. (Doc. 31-2 at 318). Ms. Whitelock stated on behalf of IHS that since the Tribe had not presented this argument as a proper claim to the contracting officer, the Agency could not consider this argument. (Doc. 31-2 at 320). The Tribe responded by letter dated February 1, 2019, arguing that its claim for "total contract costs" under the ISDEAA encompassed its claims based on a failure to include third-party dollars in the direct cost base. The Tribe argued that these were not new claims but rather was "additional evidence pertaining to damages springing from . . . [the] same factual claim[s]" for indirect and direct contract support cost shortfalls" and argued that the Tribe "is not precluded from changing the amount of the claim or producing additional data in support of increased damages." The Tribe also stated that even if this increase in damages were held to be a new claim, given IHS's litigation position and the recent mandate issued in *Sage*, equitable tolling

6

would apply, as acknowledged by the Court of Federal Claims in *Al-Jurthoor Contracting Co. v. United States*, 120 Fed.Cl. 599, 615 (2016).

On September 30, 2019, the Chief of the Contracting Office in Aberdeen, South Dakota sent its final decision to Mr. Reider, President of the Tribe, denying the Tribe's CDA claims and asserting a counterclaim.[2] (Docs. 1, ¶ 47; 1-4). IHS detailed the following reasons for the denial: 1) IHS met the Government's contractual responsibilities to the Tribe in fiscal years 2011-2013 by paying the full amount of contract support costs incurred by the Tribe for those years; 2) IHS fully obligated the Congressional cap on contract support costs in fiscal years 2011-2013 and is barred from paying additional contract support costs for those years; and 3) the wrongful carryforward adjustment claim for fiscal year 2011 is unsupported by fact or law. (Doc. 1-4 at 143). In the September 30, 2019, letter, IHS made a counterclaim for $392,240 seeking a refund on an alleged overpayment. (Docs. 1, ¶ 47; 1-4 at 146).

The Tribe filed an action in federal court against Defendants within 12 months after receipt of the IHS decision, as authorized by the Contract Disputes Act. (Doc. 1, ¶ 48) (citing 41 U.S.C. § 7104(b)(3)). In its Complaint, the Tribe seeks a declaratory judgment that in fiscal years 2011 through 2013 the Secretary acted in violation of the ISDEAA and breached its contracts with the Tribe by failing to pay the full amount of contract support costs that the Tribe alleges it was due under its ISDEAA contracts and the statute, and seeks a money judgment of $2,383,332, together with interest, and attorneys' fees. (Doc. 1, ¶ 80). Specifically, the Tribe alleges the following claims: 1) Count I – breach of contract (underpayment of direct and indirect support costs) for $1,705 and $1,169,394 in damages, respectively; 2) Count II – breach of contract (failure to pay indirect contract support costs associated with third-party revenues-funded portion of the program for $835,998 in damages; 3) Count III – breach of contract (lost third-party revenues) for $349,657 in damages[3]; 4) Count IV – breach of contract (lost indirect csc funding on unpaid direct csc funding for $737 in damages; 5) Count V – breach of contract (wrongful carryforward adjustment)

---

[2]     The contracting officer's final decision letter did not address any relief sought by the Tribe based on third-party revenues.

[3]     With regard to Count III, the Tribe alleges that IHS's failure to fully fund the Tribe's indirect contract support costs for fiscal years 2011 through 2013 caused the Tribe to divert program dollars to cover fixed administrative and overhead costs which would have been available for additional program services and associated third-party revenues. (Doc. 1, ¶¶ 36, 65).

for $26,578 in damages; 6) Count VI – breach of statutory right for $2,383,332 in damages. (Doc. 1).

Defendants have moved to dismiss Counts II, III, and VI of the Tribe's Complaint pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure for lack of subject matter jurisdiction for allegedly failing to present these claims to the Indian Health Service. (Docs. 15, 16). The motion has been fully briefed by the parties and is ready for disposition.

## LEGAL STANDARD

"Federal courts are not courts of general jurisdiction and have only the power that is authorized by Article III of the Constitution and statutes enacted by Congress pursuant thereto." *Winnebago Tribe of Neb. v. Babbitt*, 915 F.Supp. 157, 162 (D.S.D. 1996) (quoting *Marine Equipment Mgmt. Co. v. United States*, 4 F.3d 643, 646 (8th Cir. 1993)). "The threshold inquiry in every federal case is whether the court has jurisdiction and the Eighth Circuit has admonished district judges to be attentive to a satisfaction of jurisdictional requirements in all cases." *Id.* (internal quotations and citation omitted).

Under the Contract Disputes Act ("CDA") "[e]ach claim by a contractor against the Federal Government relating to a contract shall be submitted to the contracting officer for a decision," "in writing," and "[f]or claims of more than $100,000 . . . the contractor shall certify [the claim]." 41 U.S.C. § 7103(a), (b). Thus, "[a] valid final decision by the contracting officer [on a claim] is a 'jurisdictional prerequisite' to further legal action thereon." *Johnson Controls World Servs., Inc. v. United States*, 43 Fed.Cl. 589, 592 (1999) (quoting *Sharman Co. v. United States*, 2 F.3d 1564, 1568 (Fed. Cir. 1993)). As a waiver of sovereign immunity, the CDA must be strictly construed in favor of the sovereign. *Diversified Maintenance Sys., Inc. v. United* States, 110 Fed.Cl. 612, 614 (2013).

"A court deciding a motion under Rule 12(b)(1) must distinguish between a 'facial attack' and a 'factual attack.'" *Osborn v. United States*, 918 F.2d 724, 729 n.6 (8th Cir. 1990). A facial attack on jurisdiction "is based on the complaint alone or on undisputed facts in the record." *Harris v. P.A.M. Transp., Inc.*, 339 F.3d 635, 637 (8th Cir. 2003). In a facial attack, the court restricts itself to the face of the pleadings, and the non-moving party receives the same protections as it would defending against a motion brought under Rule 12(b)(6). *Carlsen v. GameStop, Inc.*, 833

8

F.3d 903, 908 (8th Cir. 2016). In a factual attack, the court considers matters outside the pleadings, and the non-moving party does not have the benefit of 12(b)(6) safeguards. *Id.* Considering "matters outside the pleadings, when subject matter jurisdiction is challenged under Rule 12(b)(1)" does not "convert the 12(b)(1) motion to one for summary judgment." *Harris*, 339 F.3d at 637 n.4.

> Because at issue in a factual 12(b)(1) motion is the trial court's jurisdiction—its very power to hear the case—there is substantial authority that the trial court is free to weigh evidence and satisfy itself as to the existence of its power to hear the case. In short, no presumptive truthfulness attaches to the plaintiff's allegations, and the existence of disputed material facts will not preclude the trial court from evaluating for itself the merits of jurisdictional claims.

*Osborn*, 918 F.2d 724, 730 (8th Cir. 1990). The Tribe, as the party invoking jurisdiction, bears the burden to establish it. *See Green Acres Enters., Inc. v. United States*, 418 F.3d 852, 856 (8th Cir. 2005).

It appears to the Court that Defendants characterize their motion as factual attack on the Court's jurisdiction because they are asking the Court to consider in its analysis the Dispute Calculation and Information forms that were attached as exhibits to the Defendant's Declaration in support of its Motion to Dismiss, (Doc. 17-1). (Doc. 24 at 242) ("In determining subject-matter jurisdiction, the court has authority to looking beyond the pleadings. The government acknowledges as much in asking the Court to review the Tribe's CDA claims letters to determine whether they were properly presented and exhausted."). However, the Court finds that the Dispute Calculation and Information forms are not extraneous to, but rather are embraced by the pleadings. *See Ashanti v. City of Golden Valley*, 666 F.3d 1148, 1151 (8th Cir. 2012) (stating that materials embraced by the complaint include "documents whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the pleading."). Attached to the Tribe's Complaint is the November 3, 2017, letter setting forth the Tribe's Contract Disputes Act claim for unpaid contract support costs due in fiscal years 2012-2013. (Doc. 1-3). Although the Dispute Calculation and Information forms that support the Tribe's fiscal years 2012-2013 claims were not attached to the complaint, they were explicitly referenced in the November 3rd letter and incorporated therein by reference. (Doc. 1-3) ("The claim amount is calculated pursuant to the Flandreau Santee Sioux Tribe Contract Dispute Calculation and Information forms, copies of which are attached hereto, which forms are incorporated herein by this reference."). The

9

parties do not dispute the authenticity of the Dispute Calculation and Information forms and the Court concludes that they are embraced by the pleadings.

However, as Defendants have challenged the jurisdictional factual assertion that the Tribe filed claims for reimbursement of all of its unpaid contract support costs incurred in fiscal years 2011 through 2013 (*see* Doc. 1, ¶ 46), the court may consider relevant evidence outside the pleadings to resolve that factual dispute. *See Diversified Maintenance Sys., Inc. v. United States*, 110 Fed.Cl. 612, 615 (2013). In ruling on this type of Rule 12(b)(1) motion, the court need not accept bare allegations in a plaintiff's pleadings. *Disability Support Alliance v. Heartwood Enterprises, LLC*, 885 F.3d 543, 547 (8th Cir. 2018). In a fact-based Rule 12(b)(1) challenge to subject matter jurisdiction, the court has discretion to hold an evidentiary hearing, weigh the evidence, and make findings to resolve disputed fact issues. *See id.* The court may receive competent evidence such as affidavits, deposition testimony, and the like in order to determine the factual dispute. *Titus v. Sullivan*, 4 F.3d 590, 593 (8th Cir. 1993); *see also Osborn*, 918 F.2d at 730 ("As no statute or rule prescribes a format for evidentiary hearings on jurisdiction, any rational mode of inquiry will do.").

In its brief in opposition to Defendant Motion to Dismiss, the Tribe stated that with regard to the Tribe's fiscal year 2012-2013 claims, it provided at the contracting officer's request, a document in support of the Claims Letters that included the amount of contract support costs owed on the Tribe's third-party program income. (Doc. 24 at 251). However, the additional documentation allegedly provided to the contracting officer was not presently in the record on the Motion to Dismiss. To assist the Court in its jurisdictional analysis, on September 15, 2021, the Court issued an Order requesting the parties to file by stipulation, if possible, any documents the Tribe provided to Indian Health Service in support of its claims based on third-party revenues.

On September 23, 2021, the Government filed an Unopposed Motion to File Settlement Correspondence Under Seal and filed concurrently under seal documents responsive to the Court's Order. (Doc. 31). On September 24, 2021, Government also filed a Motion for Leave to File a Separate Response to the Court's Order. (Doc. 32). The Court granted both motions. (Docs. 33; 34).

## DISCUSSION

Under the Contract Disputes Act, "[e]ach claim by a contractor against the Federal Government relating to a contract shall be submitted to the contracting officer for a decision." 41 U.S.C. § 7103(a)(1). "A valid final decision on a claim by the contracting officer is a 'jurisdictional prerequisite' to further legal action thereon." *Johnson Controls World Servs., Inc. v. United States*, 43 Fed.Cl. 589, 592 (1999) (quoting *Sharman Co. v. United States*, 2 F.3d 1564, 1568-69 (Fed. Cir. 1993)); *see also K-Con Bldg. Sys., Inc. v. United States*, 778 F.3d 1000, 1005 (Fed. Cir. 2015) ("Jurisdiction requires both that a claim meeting certain requirements has been submitted to the relevant contracting officer and that the contracting officer has issued a final decision on that claim."). Although the CDA does not specify the elements of a valid claim, courts have adopted the definition set forth in 48 C.F.R. (FAR) § 2.101: "[A] written demand or written assertion by one of the contracting parties seeking, as a matter of right, the payment of money in a sum certain, the adjustment or interpretation of contract terms, or other relief arising under or relating to the contract.'" *Claude Mayo Constr. Co. v. United States*, 128 Fed.Cl. 616, 621 (2016) (citing 48 C.F.R. § 2.101). "A claim need not be submitted in any particular form or use any particular wording, but it must provide a clear and unequivocal statement that gives the contracting officer adequate notice of the basis and amount of the claim." *K-Con Bldg. Sys., Inc.*, 778 F.3d at 1005 (Fed. Cir. 2015) (cleaned up).

Because a contracting officer's final decision is a prerequisite for the court's jurisdiction, the court may not consider "new" claims a contractor failed to present to the contracting officer. *See id.* at 1005. A claim is new when it either requests "different remedies (whether monetary or non-monetary) or assert[s] grounds that are materially different from each other factually or legally." *Id.*; *see also Santa Fe Eng'rs, Inc. v. United States*, 818 F.2d 856, 859 (Fed. Cir. 1987) (concluding that the claim was determined to be new, not the same because "a profound alteration occurred in the scope of th[e] claim."). "[M]erely adding factual details or legal argumentation does not create a different claim, but presenting a materially different factual or legal theory . . .does create a different claim." *K-Con Bldg.*, 778 F.3d at 1006. "Materially different claims will necessitate a focus on a different or unrelated set of operative facts." *Lee's Ford Dock, Inc. v Secretary of the Army*, 865 F.3d 1361, 1369 (Fed. Cir. 2017).

In determining whether the assertion constitutes a new claim, the critical test is whether the contracting officer's right to adjudicate the claim is undermined by circumventing his statutory role "to receive and pass judgment on the contractor's entire claim." *Cerberonics, Inc. v. United*

*States*, 13 Cl.Ct. 415, 418 (1987); *see also K-Con*, 778 F.3d at 1006 ("This approach, which has been applied in a practical way, serves the objective of giving the contracting officer an ample pre-suit opportunity to rule on a request, knowing at least the relief sought and what substantive issues are raised by the request."); *Pueblo of Zuni v. United States*, 467 F.Supp.2d 1099, 1107 (D.N.M. 2006) (stating that the exhaustion requirement "gives the agency an opportunity to resolve its contract disputes without litigation"). Plaintiff bears the burden of establishing this Court's jurisdiction by a preponderance of the evidence. *Diversified Maintenance Sys.*, 110 Fed.Cl. at 615.

Defendants have moved to dismiss Counts II, III and VI of the Tribe's Complaint. Counts II and III involve claims for breach of contract. In Count II, the Tribe alleges IHS "failed to calculate and pay the administrative costs of operating the third-party revenue-funded portion of the IHS contracts by failing to include third-party revenue in the direct program base against which the Tribe's indirect costs rate was applied[.]" (Doc. 1, ¶ 62).[4] In Count III, the Tribe seeks damages in the form of lost-third-party services and revenues. (Doc. 1, ¶ 65). Specifically, the Tribe alleges that IHS's failure to pay the Tribe's administrative costs associated with operating the third-party revenue-funded portion of the IHS contracts caused the Tribe to divert program dollars to cover fixed administrative and overhead costs. (Doc. 1, ¶ 36). It is alleged that absent IHS's failure to pay the full amount of indirect contract support costs, these program dollars would have been available for additional program services from which the Tribe could have received additional third-party revenue. (Doc. 1, ¶ 36). In Count VI, the Tribe alleges that IHS's failure to pay the Tribe the full contract support costs was also in breach of its statutory duties under 25 U.S.C. § 5325(a)(2)-(3).

In its Memorandum in Support of its Motion to Dismiss, Defendants argue that Counts II, III, and VI do not arise from the same set of operative facts or legal theories as the claims the Tribe

---

[4]     Plaintiff alleges in the Complaint that the indirect cost rate is calculated by pooling indirect CSC into an "indirect cost pool," and then dividing that pool by the total amount of direct program costs that are supported, served, or benefited by the pool. (Doc. 1, ¶ 28). The indirect cost rate is then applied to (multiplied by) the direct cost base of each program supported by the pool. (Doc. 1, ¶ 28). When IHS runs a health care program, it bills Medicare, Medicaid, and private insurance programs, collects revenues from those programs ("third-party revenues"), and uses those revenues to operate additional larger programs. (Doc. 1, ¶ 30). Plaintiffs allege that IHS wrongly applied the Tribe's indirect cost rate to the Tribe's direct cost base funded with IHS appropriations only and failed to apply the rate to that portion of the base funded with third-party revenue program dollars. (Doc. 1, ¶ 31).

presented to IHS. (Doc. 16 at 192). In addition, Defendants argue that the Tribe has failed to state a requisite sum certain for these claims.

In response, the Tribe contends that the relief sought in this Court is the same as that claimed before the contracting officer: "damages arising out of the failure of the Indian Health Service . . . to pay Claimant no less than the full amount of contract support costs." (Doc. 24 at 21). The Tribe argues that:

> The operative facts underlying that claim are the negotiated indirect cost rate and the Tribe's direct cost base against which that rate is measured. The rate times the base gives the amount owed on the contract. These are the same operative facts as underlie the Complaint.

(Doc. 24 at 21-22).

## A. Different factual or legal basis?

In examining whether the Tribe's claims present a different factual or legal basis than those presented to Indian Health Services, the Court finds it helpful to discuss some of the cases that have analyzed this issue.

In *Scott Timber Co. v. United States*, the Court of Federal Claims concluded that the plaintiff's claims alleged in federal court were the same as those presented to the contracting officer, despite the fact that the plaintiff was asserting slightly differing legal theories of recovery. 40 Fed.Cl. 492 (1998), *aff'd in relevant part on appeal*, 333 F.3d 1358 (Fed. Cir. 2003). There, a dispute arose when the Forest Service suspended Scott's performance on timber contracts in order to protect a tiny bird indigenous to the forest areas covered by the contract. *Id.* at 499. Scott submitted formal claims to the contracting officer under the CDA, claiming that the Forest Service's prolonged suspensions of its contracts constituted a breach of contract. *Id.* The contracting officer denied all of Scott's breach of contract claims and Scott subsequently filed breach of contract actions for each of its contracts in the United States Court of Federal Claims. *Id.* In his lawsuit, Scott argued that the Forest Service lacked the authority to suspend operations under the contracts for an indefinite and extended period of time and sought damages equal to the cost of obtaining replacement timber in the open market. *Id.* at 499-500.

The Forest Service contested the court's jurisdiction over several claims asserted by Scott, arguing that Scott raised new claims in the lawsuit that were not previously presented to the

contracting officer as the CDA requires. *Id.* The Federal Claims Court rejected the Government's argument and found that although Scott highlighted specific contractual provisions to support his federal claims, "the basic theory underlying his claim is essentially the same as the theory that was presented to the CO—namely, that the Forest Service's suspension of plaintiff's contracts was wrongful, and therefore a breach of the contracts." *See id.* The court also found that "the relief sought . . . [was] essentially the same relief that plaintiff sought in its claim to the CO— specifically, consequential damages for the government's alleged breach of its contracts with plaintiff." *Id.* at 500. On summary judgment, the court determined that it had jurisdiction over Scott's claims and denied both parties' cross motions for summary judgment. *Id.* at 499-500, 508.

Scott filed an appeal with the Federal Circuit Court of Appeals. In its defense of the lawsuits, the Forest Service again raised its claim that Scott alleged new claims in the lawsuit that were not previously presented to the contracting officer. *Scott Timber Co. v. United* States, 333 F.3d 1358 (Fed. Cir. 2003). Specifically, the Forest Service reasoned that:

> Scott's original CDA claims questioned broadly the authority of the Forest Service to suspend the § 318 contracts and the reasonableness of the duration of those suspensions....Scott cannot raise new claims, such as the clause C6.25 warranty issue[5], the objections to Forest Service's preparation and administration of the contracts, and the claims for reimbursement provided under contract terms[6]...those claims were not "clearly and unequivocally" presented to the CO.

*Id.* at 1365. The Federal Circuit concluded that the Court of Federal Claims correctly found that it had jurisdiction over Scott's claims. *Id.* at 1365-66. The court reasoned that:

> In this case, Scott gave the CO clear notice of a purported breach of contract based on the prolonged and allegedly unauthorized suspensions. Moreover Scott sought from the CO the same remedy sought from the trial court, namely consequential damages for the alleged breach. Scott may have posed slightly different legal theories for the breach, but Scott's claim is essentially the same as presented to the CO. Thus, Scott's claims in this case would not "subvert the statutory purpose of requiring contractors first to submit their claims to the [CO]" to allow the CO to receive and pass judgment on the contractor's entire claim.

---

[5] Scott had argued in his lawsuit that contract clause C6.25 did not create a warranty or representation that adequate measures had been taken to protect sensitive species in designing the § 318 contracts. *Id.* at 1364.

[6] Scott argued that the suspensions constituted a contract modification "to provide additional protection" for the endangered bird giving rise to reimbursement of out-of-pocket costs under contract clause C6.25. *Id.* at 1364.

14

*Id.* at 1365-66.

As in *Scott*, in *Cerberonics, Inc. v. United* States, 13 Cl.Ct. 415 (1987), the Court of Federal Claims concluded that the plaintiff's alleged claims were the same claims as those presented to the contracting officer. In *Cerberonics*, the plaintiff sought monetary relief from the Government under the terms of a service contract with the Navy. *Id.* at 416. The plaintiff submitted a claim to the Navy contracting officer seeking a "fair and equitable fee" of $36,120 on account of finance charges incurred due to a late payment by the Government as well as services rendered in procuring a jet engine at the best available price. *Id.* In addressing the Government's argument, the court acknowledged that the plaintiff's action, although in the identical sum of $36,120, was not couched in exactly the same language as the claim presented to the contracting officer. *Id.* at 418. The court noted:

> In its three causes of action, plaintiff seeks an "equitable adjustment" of the home office logistics support line, either (1) pursuant to contract section H-6 authorizing adjustments of fixed price items and award fee to reflect changed requirements, (2) pursuant to the contract's changes clause, or (3) in recognition of a constructive change to the contract. The second and third causes of action specify that the equitable adjustment claimed is for "additional costs incurred and a reasonable profit thereon." Thus, plaintiff's Claims Court complaint deviates from the terminology of the original claim before the contracting officer, omitting such wording as "finance charges (resulting from a) late payment" and "obtaining the best available price," and inserting citations to specific contract provisions.

*Id.* The court concluded, however, that,

> [N]either the language of plaintiff's complaint nor its explanation of this action in accompanying briefs and at oral argument indicate that it is based on a different set of operative facts or seeks different categories of relief. Both the "fair and equitable fee" sought by Cerberonics in its claim with the contracting officer and the "equitable adjustment" sought in this court are based on the work and experience associated with procuring the spare jet engine.

*Id.* In *Cerberonics*, the court stated "[a]t the contracting officer level, [the plaintiff] simply stated the elements of its claim and left to the CO the task of determining the applicable contract provisions on which to base a ruling." *Id.* The court in *Cerberonics* concluded that:

> As such, plaintiff's complaint augments the legal theories underlying its claim. But it does not change the essence of that claim—*i.e.*, that plaintiff is entitled, based on its contractual relationship with defendant, to compensation of $36,120 for the

procurement services and late payment penalty associated with the purchase of the spare jet engine.

*Id.* at 419.[7]

In contrast to *Cerberonics* and *Scott*, in *Santa Fe Engineers, Inc. v. United States*, the Federal Circuit Court of Appeals concluded that it lacked jurisdiction over plaintiff's claims because plaintiffs had failed to exhaust their claims before the proper governmental administrative agency. 818 F.2d 856 (Fed. Cir. 1987). There, the plaintiffs had entered into a contract with the Government for additions and renovations to Ireland Army Hospital, Fort Knox, Kentucky. *Id.* at 857. The plaintiff certified a claim to the contracting officer for labor costs associated with three change orders, designated "AD," "CD," and "HK" that were issued by the Government. *Id.* In proceedings before the Armed Services Board of Contract Appeals (Board), the plaintiffs sought to recharacterize its claims as a "total job disruption" and stated that its claim represented not only the total impact from change orders "CD" and "HK" but also from "the collective nature of all the problems, changes and directives that were issued on the project." *Id.* at 857-58. The plaintiffs alleged in federal court that "[a] multiplicity of change orders were issued at Fort Knox to resolve and correct problems, and the problems are what the claim is based on." *Id.* at 858. The plaintiff stated that it submitted a total labor cost claim for inefficiencies because there was no way to quantify the impact from any individual change on the project. *Id.*

On appeal before the Federal Claims Court, the court affirmed the Board's finding that it had no jurisdiction over the plaintiff's claim for the total increase in costs because that general claim had not been presented or certified to the contracting officer. *Id.* at 859. The court stated that "[n]ot only did petitioner's representatives attribute the claim it was now making before the Board to the collective nature of *all* changes or the multiplicity of change orders or design difficulties unrelated to those three particular change orders on which its original claim was grounded, but such unrelated problems (e.g. the "attic space" and "duct work" problems) were directly brought out as part of petitioner's claim." *Id.* at 859-60.; *see also Lee's Ford Dock, Inc. v. Secretary of the Army*, 865 F.3d 1361, 1370 (2017) (concluding that the Armed Service Board of Contract Appeals did not have jurisdiction over the plaintiff's misrepresentation claim because

---

[7]     The Court finds that these facts are similar to those in *Scott* where the facts underlying the breach of contract were the same as those presented to the contracting officer, but the contractor based its breach of contract claims raised in federal court upon different provisions in the contract.

the allegations in the plaintiff's administrative complaint were limited to the Corp's "mistaken belief about the condition of Wolf Creek Dam," and did not encompass any "knowing misrepresentation" as to the state of the dam); *K-Con Bldg. Sys., Inc. v. United States*, 778 F.3d 1000, 1006 (Fed. Cir. 2015) (concluding that a claim for "breach of contract for not constructing a building on time" is different from a claim of "breach of contract for constructing with the wrong materials"); *Kiewit Constr. Co. v. United States*, 56 Fed. Cl. 414, 420 (2003) (finding no jurisdiction where "the Type I differing site conditions claims submitted to the contracting officer and the defective specifications claim made in Count I [of the complaint before the court] rely upon different operative facts"); *ThermoCor, Inc. v. United States*, 35 Fed. Cl. 480, 489 (1996) (finding jurisdiction for a claim where "[t]he factual bases for the equitable adjustment claim for increased quantities were submitted to the contracting officer [and] [p]laintiff has not raised a claim for any additional expenses or items"); *LDG Timber Enters., Inc. v. United States*, 8 Cl. Ct. 445, 452-53 (1985) (finding that the Claims Court had no jurisdiction over a new claim for damages related to mismarked Forest Service timber, when the claim presented to the contracting officer was only for damages related to faulty estimates of the amount and type of timber available for harvest).

In *Dodson Livestock Co. v. United States*, the plaintiff filed a certified claim with a government contracting officer concerning damages allegedly sustained by the plaintiff because of breach of representations concerning sheep purchased by the plaintiff from the United States Meat Animal Research Center. 42 Fed.Cl. 455, 457-58 (1998). The Department of Agriculture issued a final rejection of the plaintiff's claim and the plaintiff subsequently filed his complaint in the Federal Court of Claims alleging claims for breach of representation of warranty for 18 sheep he had purchased from the Government. *Id.* at 458-59. The Government filed a motion to dismiss on the basis that the plaintiff had failed to present his claims to the contracting officer for damages related to all 18 sheep purchased from the Government, arguing that the plaintiff's administrative claim was limited to damages resulting from a single ram that was infected with paratuberculosis. *Id.* at 459. Because they had come into contact with the infected ram, the plaintiff sold for slaughter his remaining herd and cashmere goats and sought damages for lost profits estimated at $57,628,202. *Id.* at 456.

The court in *Dodson* found that the plaintiff's claim to the contracting officer was limited to breach of warranty for the single ram purchased, not for all 18 sheep purchased. *Id.* at 462. The court rejected the plaintiff's argument that the introduction to his claim encompassed all eighteen sheep. *Id.* at 461. The court found that although the introduction spoke generally of "sheep purchased," the introduction provided no information on how many sheep were offered for sale, how many were purchased, or how many sheep on which the government "breached representations." *Id.* The court found that "[i]n contrast to this generality and lack of specificity in the introductory paragraph, there is particularity in the words used to present the specifics of plaintiff's claim to the contracting officer." *Id.* The court noted that throughout the claim, there was specific reference made to one ram, and no other sheep and that the claim incorporated by reference a single bill of sale. *Id.* The court acknowledged that while a contractor may increase the amount of its claim, it may not raise new claims or theories of recovery not presented to the contracting officer for final decision. *Id.* at 460. The court found that breach of warranty claims regarding all but the one ram referenced in plaintiff's administrative claim were new claims and concluded that it did not have jurisdiction over these new claims because they had not been presented to the contracting officer. *Id.* at 461-62.

*Pueblo of Zuni v. United States* involved a class action seeking damages for the government's alleged failure to pay the full contract amounts specified in contracts between Indian Tribes and Indian Health Services that were awarded under the Indian Self-Determination and Education Assistance Act. 467 F.Supp.2d 1099 (D.N.M. 2006). In April 2001, prior to filing the lawsuit, plaintiff notified the IHS contracting officer of twenty-two contract disputes related to its contracts in effect during fiscal years 1993-1998. *Id.* at 1104. The legal basis for these CDA claims was that IHS allegedly had failed to pay the full amount of Zuni's indirect contract support costs, as calculated under the plaintiff's indirect cost rate ("shortfall claims"). *Id.* The plaintiffs amended their CDA claims in September 2001 to include a claim for IHS's alleged failure to make adjustments in calculating the full amount of costs associated with 7 of the 22 contracts plaintiffs had presented to the contracting officer in April 2001 ("miscalculation claims"). *See id.* There were no contracts after fiscal year 1995 submitted to the contracting officer under the miscalculation theory. *Id.* at 1104-05. According to the government's description of the two categories of claims, "Claim One" asserted that IHS should have awarded indirect contract support costs by calculating the contract's direct program base funding and multiplying that amount by

Zuni's indirect cost rate in effect in that year. *Id.* at 1104 n.2. For these claims, the plaintiff sought a total of $324,213.36. *Id.* The government described "Claim Two" as alleging that IHS should have awarded indirect contract support costs only after first upwardly adjusting Zuni's indirect cost rate in effect in that year to account for the alleged underpayment of indirect contract support costs in connection with other, non-ISA (and non-IHS) federal contracts. *Id.* at 1304 n.2. The amended claims brought the total amount of relief sought to $339,933.44. *Id.* at 304.

The defendants in *Pueblo of Zuni* brought a motion to dismiss the plaintiffs' claims for fiscal years subsequent to any of the claims which were submitted to the contracting officer (for example, any claims from contract disputes in fiscal years after 1998). *Id.* at 1111. Other claims the defendants sought to dismiss were those from the same fiscal years which may already have been exhausted in April 2001, but which requested additional funding based on a different theory of relief—IHS's alleged failure to correctly adjust the indirect cost rate. *Id.*

The court dismissed for lack of jurisdiction plaintiffs' claims arising subsequent to fiscal year 1998 on the basis that they did not involve the same set of operative facts as those which arose from prior to fiscal year 1998. *Id.* The court stated that "[c]ontract disputes from fiscal years beyond FY 1998 will necessarily concern facts as well as negotiated terms and amounts which differ from contracts arising from previous years." *Id.* The court also dismissed any miscalculation claims beyond fiscal year 1993 that had not been submitted to the contracting officer in September 2001. *See id.* The court reasoned that "these claims request relief over and above the amounts requested in the contracts submitted in April 2001, based on a new legal basis underlying IHS' alleged deficiency." *Id.* The court stated that "[o]ne way to ascertain whether the new set of claims involves a distinct set of operative facts is to ask whether the denial of one claim or type of claim "would not necessarily preclude recovery of the other." *Id.* (citing *Johnson Control's*, 43 Fed.Cl. at 593). The court found that "Plaintiff could theoretically fail on the merits on a miscalculation theory, without necessarily precluding monetary relief on the shortfall claims." *Id.* Additionally, the court found that the plaintiffs' September 2001 claims rested on a different set of operative facts because the claims submitted to the contracting officer in April 2001 alleged that IHS failed to pay each contract in full and did not mention a failure to adjust the indirect cost rate. Accordingly, the court found that it lacked jurisdiction over any miscalculation claims for fiscal years that had not been submitted to the contracting officer in September 2001. *Id.*

As stated above, the guiding principle in determining whether the Tribe is asserting a new claim is whether the contracting officer was provided an opportunity "to receive and pass judgment on the contractor's entire claim." *Cerberonics, Inc. v. United States*, 13 Cl.Ct. at 418 (1987); *Pueblo of Zuni v. United States*, 467 F.Supp.2d at 1110 ("The contracting officer must be afforded 'adequate notice of the basis and amount of the claim.'"). In the *Scott* and *Cerberonics* cases, the plaintiffs' breach of contract claims before the contracting officer and in federal court were based on the same set of facts, but the plaintiffs had grounded their federal claims on alleged breaches of specific and/or different contractual provisions. In both cases, the contracting officer was provided an opportunity to pass judgment on the claimant's entire claim even though the contracting officer was left to the task of determining the applicable contract provisions on which to base a ruling. By contrast, the courts concluded in *Santa Fe Engineers* and in *Dodson* that the contracting officer was not provided an opportunity to pass judgment on the plaintiffs' entire claim, finding in the case of *Santa Fe,* that a claim for labor costs limited to 3 change orders was not the same as one for labor costs resulting from all project changes and problems, and finding in the case of *Dodson*, that a claim for damages based on the sale of one ram was not the same as a claim based on the sale of 18 sheep. The Court finds instructive the *Pueblo of Zuni* case which is factually more similar to the present case. Like the Tribe in the instant case, the plaintiffs in *Pueblo of Zuni* had claimed to the contracting officer that IHS had failed to pay each contract in full. 467 F.Supp.2d at 1111. However, the court found that after fiscal year 1993, there was no mention in the claims before the contracting officer about a failure by IHS to adjust the indirect cost rate. *Id.* Although a failure to adjust the indirect cost rate upward certainly influenced the total contract costs paid to the plaintiffs, the court concluded that this claim had not been presented to the contracting officer because they were "based on a new legal basis underlying IHS' alleged deficiency" and "rest[ed] on a different set of operative facts." *Id.*

The Court finds that there are many variables that influence the contract support costs owed to a tribe under an ISDEAA agreement. For example, in examining the Tribe's fiscal year 2012 and 2013 claims to the contracting officer, one finds that a failure to pay the full amount of contract support costs may result from deficiencies including, but not limited to: 1) the underpayment of the National Business Center ("NBC") approved rate as calculated by multiplying the NBC approved indirect cost rate by the IHS direct contract base for each fiscal year; 2) the inclusion of non-paying agencies in the direct cost case, resulting in an improper reduction in the indirect cost

rate; 3) the improper reduction in the indirect cost rate resulting from wrongful carryforward adjustments for the second cycle of double dipping; 4) the shortfall in dollars in the carryforward template; 5) the failure to pay the full amount of direct contract support costs; and 6) the failure to pay indirect costs on unpaid direct contract support costs. (Doc. 17-1). The case law does not support the Tribe's argument[8] that its claims are the same as those presented to the contracting officer regardless of the factual basis the Tribe presented to the contracting officer to support its contract support costs shortfall claim. *See, e.g., Tunica-Biloxi Tribe of La. v. United States*, 577 F.Supp.2d 382, 413 (D.D.C. 2008) ("Ramah Navajo could not have raised both the Rate Dilution and Carry-Forward Claims without demonstrating the amount of funding lost by each of these alleged practices because the damages arising from them are discrete and cumulative; *i.e.*, they could not be determined by reference to each other, but only by engaging in separate analyses with respect to each claim, the results of which could then be considered together to produce a final damages calculation."). IHS may find that the Tribe is entitled to monetary relief for its shortfall claim stated in Claim 1 even if it rejected the Tribe's claim that it was entitled to unpaid contract supports costs on the third-party revenue-funded portion of the Tribe's operations. *See Johnson Control's*, 43 Fed.Cl. at 593 ("One way to ascertain whether the new set of claims involves a distinct set of operative facts is to ask whether the denial of one claim or type of claim would . . . preclude recovery of the other."). Under the instruction provided by the courts in the *Pueblo of Zuni, Dodson*, and *Santa Fe Engineers* cases the Tribe must have presented the factual and legal bases and monetary relief sought for these claims to the contracting officer for his or her consideration. Failure to do so would prevent IHS from giving the contracting officer adequate notice of the basis and amount of these claims and pass judgment thereon.

In its fiscal year 2011 Dispute Calculation and Information form, the Tribe did not detail the factual or legal basis for its claims based on third-party revenues, nor did it detail a "sum certain" for this claim. The Tribe's fiscal year 2011 form detailed "expectancy and other damages" in the amount of $0. (Doc. 1-3). In its fiscal year 2011 form, the Tribe asserted a claim "for all damages arising out of the failure of Indian Health Service (IHS) to pay full contract support costs

---

[8]    *See* Doc. 24 at 21 ("The relief sought in this Court under the Complaint, however, is the same as that claimed before the contracting officer: 'damages arising out of the failure of the Indian Health Services . . . to pay Claimant no less than the full amount of contract support costs. . . .'").

(including indirect costs and direct contract support costs) in a timely manner and in compliance with those aforementioned statutes and applicable law." (Doc. 1-3). In its fiscal year 2011 claim, the Tribe further asserted that "IHS failed to meet its contractual and statutory obligations by failing to pay the full amount of Claimant's contract support cost requirement calculated pursuant to IHS's policies, and by applying an unlawful policy limiting the total amount that would be paid to Claimant." (Doc. 1-3).

The Court finds, however, that the Tribe did present the factual and legal basis for Counts II and III in its fiscal year 2012-13 Contract Dispute Calculation and Information form.[9] (Doc. 17-1). In Count II of the Tribe's Complaint, the Tribe alleges that IHS "failed to calculate and pay the administrative costs of operating the third-party revenue-funded portion of the IHS contracts" by failing to include third-party revenue in the "direct program base against which the Tribe's indirect costs rate was applied[.]" (Doc. 1, ¶ 62).[10] In Count III, Plaintiff seeks damages in the form of lost-third-party services and revenues. (Doc. 1, ¶ 65). The factual and legal basis for these claims were detailed in the Tribe's Claim 7 for Expectancy damages in which the Tribe claimed the following: (1) the amount of unpaid direct contract support costs and indirect costs paid from direct cost funding that should have been available for additional program services; and (2) the amount of third party revenues that would have been generated from the unpaid direct contract support costs and indirect costs paid from direct cost funding based upon the % of third party revenues compared to the direct cost award. (% multiplied by $ = amount of expectancy claim.). (Doc. 17-1). However, as pointed out by Defendants, an issue remains as to whether the Tribe

---

[9]    As discussed above, the Tribe's FY2012-2013 Contract Dispute Calculation and Information forms were incorporated by reference into the Tribe's Contract Disputes Act claim letter for these fiscal years, a letter which was attached to the Tribe's Complaint. (Doc. 1-3).

[10]    The Tribe alleges in the Complaint that the indirect cost rate is calculated by pooling indirect CSC into an "indirect cost pool," and then dividing that pool by the total amount of direct program costs that are supported, served, or benefited by the pool. (Doc. 1, ¶ 28). The indirect cost rate is then applied to (multiplied by) the direct cost base of each program supported by the pool. (Doc. 1, ¶ 28). When IHS runs a health care program, it bills Medicare, Medicaid, and private insurance programs, collects revenues from those programs ("third-party revenues"), and uses those revenues to operate additional larger programs. (Doc. 1, ¶ 30). The Tribe alleges that IHS wrongly applied the Tribe's indirect cost rate to the Tribe's direct cost base funded with IHS appropriations only and failed to apply the rate to that portion of the base funded with third-party revenue program dollars. (Doc. 1, ¶ 31). IHS's failure to fully fund the Tribe's indirect CSC for fiscal years 2011 through 2013, the Tribe alleges, caused the Tribe to divert program dollars which otherwise would have been available to provide additional program services for additional third-party revenues. (Doc. 1, ¶ 36).

satisfied the jurisdictional requirement that these claims detail a "sum certain." This issue will be addressed further below.

In addition to their breach of contract claims, in Count VI of its Complaint, the Tribe alleges that the IDEAA creates a right of action for money damages to remedy the Secretary's breach of his obligations arising under the statute, 25 U.S.C. § 5331. (Doc. 1, ¶ 76). The Tribe alleges that under 25 U.S.C. § 5325(a)(2)-(3), the Secretary in fiscal years 2011 through 2013 had a statutory duty to pay the Tribe full contract support costs and that the Tribe lost an additional amount of $376,235 as a result of this statutory violation. (Doc. 1, ¶¶ 78-79). The Tribe alleges that in order to remedy the Secretary's breach of his statutory obligations, the Tribe is entitled to damages of no less than $2,383,332 plus interests and attorneys' fees and costs. (Doc. 1, ¶ 80).

Defendants contend that the Tribe failed to present to IHS a "breach of a statutory right" as a legal basis of recovery in any of its claims letters from fiscal years 2011 through 2013, and argues that without any elaboration, the Tribe seeks $376,235 in damages for this new legal theory. (Doc. 16 at 195). Defendants argue that neither this claim nor this "sum certain" appear in the Tribe's claim letters and assert that the Tribe's damages claim for this alleged statutory violation "is untethered to any . . . other count in the complaint." (Docs. 16 at 195; 28 at 288). The Tribe contends that their breach of statutory right claim is not a new claim, but "reiterates the violation of the contract and hence the statute (ISDEAA) containing the model agreement and payment requirements alleged in the Tribe's CSC shortfall, wrongful carryforward, and expectancy claims present in FYs 2011-2013." (Doc. 24 at 263).

The Court agrees that the factual and legal bases for the Tribe's breach of statutory right claim are the same as those underlying the Tribe's breach of contract claims alleged in its Complaint. The $2,007,097 in contract support costs claimed for Defendants' alleged statutory violation is equal to the sum of the contract support cost deficiencies claimed by the Tribe for Defendants' breaches of contract alleged in paragraphs 56 ($1,705), 57 ($1,169,394), and 63 ($835,998). In addition, the $376,235 in contract support costs claimed for Defendants' alleged statutory violation equals the sum of the contract damages claimed by the Tribe for lost-third party revenues alleged in paragraph 65 ($349,657) and from the alleged wrongful carryforward adjustment in paragraph 73 ($26,578). The Court also finds that the Tribe presented the factual and legal basis for the alleged statutory violations to the contracting officer. (*See* Docs 1-3)

(claiming right to payment "arising out of Indian Health Services' failure to pay Claimant's full contract support costs ("CSC") as otherwise required by the [ISDEAA], . . . other applicable federal law, and the provisions on the contracts and the funding agreements, as amended, in effect between the parties....").  However, as discussed below, the Court concludes that the Tribe has not established that it submitted a valid "claim" for unpaid CSC on the third-party revenue-funded portion of the Tribe's operations or for lost third-party revenues to the contracting officer for a final determination.

### B.  Did Plaintiffs fulfill the sum certain requirement?

Under the CDA, "[t]here are no 'magic words' required for a claim, but to recover money damages, a claim . . . must be '(1) a written demand or assertion, (2) seeking as a matter of right, (3) the payment of money in a sum certain.'"[11]  *United Constructors, LLC v. United* States, Civ. No. 08-757C, 2009 WL 875358, at *6 (Fed. Cl. 2009) (citing *James M. Ellett Constr. Co. v. United States*, 93 F.3d 1537, 1542 (Fed. Cir. 1996)).  The purpose of the CDA requirement that a claim contain a request for a sum certain is to provide the contracting officer with "adequate notice of the basis and amount of [the] claim."  *Williams v. United States*, 118 Fed.Cl. 533, 539 (2014) (citing *Maropakis Carpentry, Inc. v. United* States, 609 F.3d 1323, 1328 (Fed. Cir. 2010)).  For claims that are made by a contractor for more than $100,000, the contractor is also required to certify that—

    (A) the claim is made in good faith;

    (B) the supporting data are accurate and complete to the best of the contractor's knowledge and belief;

    (C) the amount requested accurately reflects the contract adjustment for which the contractor believes the Federal Government is liable; and

    (D) the certifier is authorized to certify the claim on behalf of the contractor.

41 U.S.C. § 7103(b).

In Count II of its Complaint, the Tribe claims $835,998 in damages for IHS's alleged failure "to calculate and pay the administrative costs of operating the third-party revenue-funded

---

[11] As stated above, although the CDA does not specify the elements of a valid claim, courts have adopted the definitions set forth in 48 C.F.R. (FAR) § 2.101: "[A] written demand or written assertion by one of the contracting parties seeking, as a matter of right, the payment of money in a sum certain, the adjustment or interpretation of contract terms, or other relief arising under or relating to the contract.'" *Claude Mayo Constr. Co. v. United States*, 128 Fed.Cl. 616, 621 (2016) (citing 48 C.F.R. § 2.101).

portion of the IHS contracts by failing to include third-party revenue in the direct program base against which the Tribe's indirect costs rate was applied[.]"  In Count III of its Complaint, the Tribe claims $349,657 in damages in the form of lost-third-party services and revenues.  There are no allegations or evidence before the Court showing that either of these sums were presented to the contracting officer.  The Tribe's fiscal year 2011 Contract Dispute Calculation and Information form detailed expectancy and other damages in the amount of $0.  (Doc. 1-3).  The Tribe's fiscal year 2012-13 Dispute Calculation and Information forms did not detail any dollar amount for expectancy damages relating to the "amount of unpaid direct contract support costs and indirect costs paid from direct cost funding that should have been available for additional program services," and the Tribe's fiscal year 2012-13 form detailed "$–" for the "[a]mount of third-party revenues that would have been generated from the unpaid direct contract support costs and indirect costs paid from direct cost funding based upon the % of third-party revenues compared to the direct cost award. (% multiplied by $ = amount of expectancy claim.)".  (Doc. 17-1).

Defendants argue that the Tribe's claim of $0 or "$–" does not meet the "sum certain" requirement as it does not provide IHS with adequate notice of the basis and amount of the Tribe's claim.  The CDA plainly requires a claimant to identify a "sum certain" amount and it is clear that a sum of $0 or "$–" in expectancy damages does not satisfy this requirement.  *See, e.g., RCS Enter., Inc. v. United States*, 46 Fed.Cl. 509, 514 (2000) ("The problem is that plaintiff's claim letter failed to ask for any amount based on such a claim."); *CPS Mech. Contractors v. United States*, 59 Fed.Cl. 760, 764 (2004) (finding no CDA claim when contractor "failed to provide the CO with any dollar figure or documentation that would be used to compute a dollar figure.").[12]

---

[12]    The Court also finds cases addressing the "sum certain" requirement under the Federal Tort Claims Act ("FTCA") provide insight into how courts analyze this issue.  Similar to the Contract Disputes Act, the presentation of a claim to an appropriate administrative agency is a jurisdictional prerequisite to filing a suit under the FTCA.  *See Farmers State Savings Bank v. FmHA*, 866 F.2d 276, 277 (8th Cir. 1974).  The Eighth Circuit has held that the notice requirement for filing a claim under the FTCA is met if a claimant "provide in writing (1) sufficient information for the agency to investigate the claims, and (2) the amount of damages sought[.]"  *Id.*  Courts interpreting the "sum certain" requirement for a money damages claim under the FTCA have required a claimant to state a specific monetary amount claimed.  *See, e.g. Kokaras v. United States*, 980 F.2d 20, 22 (1st Cir. 1992) (denying a FTCA claim for personal injury which stated "to be determined" without giving a monetary amount as there was no evidence that a sum certain was ever stated orally or in writing by plaintiffs' attorney); *Adams v. United States*, 807 F.2d 318, 321-22 (2d Cir. 1986) (finding a claim "in excess of $1,000.00" met the sum certain requirement for a claim of $1,000.00, regardless of accompanying complaint requesting $4,000,000.00 in damages); *Val-U Const. Co. of S.D. v. United States*, 905 F.Supp. 728, 739-40 (D.S.D. 1995) (J. Piersol) (finding that Val-U's administrative claim, which requests damages in the amount of "$698,330.68 together with statutory interest and for damages in the amount

Citing to *H.L. Smith, Inc. v. Dalton*, 49 F.3d 1563 (Fed. Cir. 1995), the Tribe argues that the CDA does not require each line of a claimant's "sum certain" to be accounted for to satisfy the presentment requirement. (Doc. 24 at 252). The Court does not find *Dalton* to be instructive in this case. In *Dalton*, the contractor, on behalf of its subcontractor, submitted various claims letters explaining the circumstances warranting equitable adjustments and time extensions under the contract along with the sums requested. *Id.* at 1563. The contracting officer handling the contractor's submissions replied that he did not consider the contractor's letters to be valid claims under the disputes clause of the contract because the contractor did not attach invoices, cost breakdowns, or other documentation explaining how it arrived at the sums requested. *Id.* Receiving no invoices, cost breakdowns, or other supporting financial documentation, the contracting officer took no further action and declined to make final decisions. *Id.* The contractor appealed the contracting officer's inaction to the Armed Servcies Board of Contract Appeals which dismissed the contractor's claims for lack of jurisdiction. *Id.* The Board held that absent information regarding calculation of the asserted amounts, the letters were not proper CDA claims. *Id.*

On appeal, the Federal Circuit court reversed, citing to its decision in *Transamerica Ins. Corp. v. United States*, 973 F.2d 1572 (Fed. Cir. 1992). As in *Dalton*, the issue in *Transamerica* was whether a contractor was required to provide cost and pricing data to support the sums requested in its claim for an equitable adjustment. The *Dalton* court noted that in *Transamerica*, it had found that compliance with the contracting officer's request for a detailed cost breakdown was unnecessary for a valid CDA claim, stating that the contracting officer's desire for more information did not change the "claim" status of the contractor's letter. *Id.* at 1565. The court in *Dalton* found that the contractor's requests, like those in *Transamerica*, met all the requirements for a valid claim because they were in writing, were submitted to the contracting officer for a decision, requested payment of a sum certain, and gave the contracting officer adequate notice of the basis and the amount of the claim. *Id.* at 1565.

The issue in this case, unlike in *Dalton* and *Transamerica*, is not that the Tribe has failed to submit data supporting the sums requested for its claims for lost third-party revenues and for

---

of judgments plus accruing interest taken against Val-U Construction fails to state a sum certain in excess of $698,330.68.");.

administrative costs paid on the third-party revenue-funded portion of its operations, but that the Tribe failed to submit a "sum certain" that accounted for the monetary relief the Tribe sought for these claims. There is no indication that the sum certain figures for any of the claims the Tribe submitted to the contracting officer in its claims letters and Dispute Calculation and Information forms encompassed the relief sought by the Tribe for administrative costs paid on the third-party revenue-funded portion of the Tribe's operations or its claims for lost third-party revenues. In its Complaint, the Tribe claims $1,204,461 in damages in excess of the damages amount presented to IHS, with the Tribe's third-party revenues-based claims ($1,185,655 in alleged damages) accounting for the majority of this difference. If the Tribe does not specify the amount of relief it believes it is entitled to for these claims, "the contracting officer cannot settle the claim by awarding a specific amount of money because such settlement would not preclude the contractor from filing suit seeking the difference between the amount awarded and some larger amount never specifically articulated to the contracting officer." *See North Star Alaska Housing Corp. v. United State*, 76 Fed.Cl. 158, 184 (2007) (internal citations and quotation omitted).

The Tribe argues that there is nothing that precludes it from seeking additional amount of damages for this claim in federal court. (Doc. 24 at 253) ("The amount claims may change after the claim is submitted."). It is true, as the Tribe argues, that courts have declined to impose so rigid of a standard as to preclude adjustments in claim amounts "based upon matters developed in litigation." *K-Con Bldg. Sys., Inc. v. United States*, 778 F.3d 1000, 1004 (Fed. Cir. 2015) (citing *Tecom, Inc. v. United States*, 732 F.2d 935, 937-38 (Fed. Cir. 1984) ("It would be most disruptive of normal litigation procedure if any increase in the amount of a claim based upon matters developed in litigation before the court [or board] had to be submitted to the contracting officer before the court [or board] could continue to a final resolution on the claim.")); *J.F. Shea Co. v. United States*, 4 Cl.Ct. 46, 54 (1983) (stating that a contractor is not precluded from changing the amount of the claim or producing additional data in support of increased damages based upon matter developed in litigation). The Federal Court of Claims has stated that a court may exercise jurisdiction over a claim, the dollar amount of which has been enlarged in the court over the amount presented to the contracting officer if:

> (1) the increase in the amount of the claim is based on the same set of operative facts previously presented to the contracting officer; and

(2) the court finds that the contractor neither knew nor reasonably should have known, at the time when the claim was presented to the contracting officer, of the factors justifying an increase in the amount of the claim.

*Al-Juthoor Contracting Co. v. United States*, 129 Fed.Cl. 599, 619 (2016); *see also Johnson Controls World Servs., Inc. v. United States*, 43 Fed.Cl. 589, 593 (1999); *AAI Corp. v. United States*, 22 Cl.Ct. 541, 544 (1991). Although the Tribe presented the factual and legal basis for its third-party revenues-based claims to the contracting officer as Claim 7 in its fiscal year 2012 and 2013 Dispute Calculation and Information forms,[13] the Tribe did not submit a sum certain for these claims and thus they failed to constitute a valid claim under the CDA. In this case, the Tribe does not argue that its claim for administrative costs paid on the third-party revenue-funded portion of its operations or its claim for lost third-party revenues was based on information gained in discovery, nor does the court see how this would be so since it appears that information relating to lost third-party revenues was always in the Tribe's possession. Nor can the Tribe claim that the increased damages amount alleged by the Tribe for these claims was due to any miscalculation because the Tribe never submitted to the contracting officer an initial sum certain for these claims. Finally, the Tribe does not argue that it had no knowledge of the factors justifying an increase in the amount of its relief sought for these claims. *See Pueblo of Zuni*, 467 F.Supp.2d at 1112 (finding that the increase in damages amount requested by the plaintiff could not be attributed to error in the plaintiff's miscalculation of damages, or from the plaintiff's learning of facts subsequent to the time the federal complaint was filed which would increase the damages amount); *see also Baha v. United States*, 123 Fed.Cl. 1, 6 (2015) (finding damages for unpaid rent accruing for consecutive three months after claim was submitted to the contracting officer arose from "same operative facts" and were permissible); *Kellogg Brown & Root Servs., Inc. v. United States*, 115 Fed.Cl. 46, 54-55 n.5 (2014) ("Increases in the amount of a claim due to the mere passage of time do not generally change a CDA claim into a new claim."); *Modeer v. United States*, 68 Fed.Cl. 131, 137 (2005) ("[I]f the dollar value of a claim increases based on new information available only after the claim was submitted to the contracting officer," the plaintiff was entitled to increased damages that "[arose] from the same operative facts as the original claim and claims the same categories of relief . . . Because the holdover rent claim for the entire holdover period arises from the same operative facts and claims the same category of relief as the holdover rent claim for the first month of the

---

[13] The Court notes that the factual basis for the Tribe's claims based on third-party revenues was not detailed in its fiscal year 2011 claims.

holdover period, and because the length of the holdover tenancy could not have been known by the Modeers at the time they presented the claim to the contracting officer, this court has jurisdiction over the entire holdover rent claim."); *Contract Cleaning Maint., Inc. v. United States*, 811 F.2d 586, 591 (Fed. Cir. 1987) ("The amount of the claim increased because the appellant had not originally included the nonpayment of the final invoice and the government's audit of the second year of the contract had resulted in the disallowance of additional amounts for which the appellant had submitted invoices. The increase in the claim, like the increase in *Tecom*, thus was "reasonably based on further information."); *Kunz Constr. Co. v. United States*, 12 Cl.Ct. 74, 79 (1987) (stating that because "the plaintiff should reasonably have included an item for increased home-office overhead in the claim in which it submitted to the contracting officer, but failed to do so, the court concludes that it cannot properly take jurisdiction over the increased home-office overhead item which the plaintiff has included in the claim presented to the court"); *Tecom, Inc. v. United States*, 732 F.2d 935, 937 (Fed. Cir. 1984) ("Where no certification of the claim was earlier compelled because the amount asked was properly less than $50,000 at that time, the contractor could legally increase its monetary demand before the ASBCA in view of the intervening prolongation of the contract and the experience of actual operation.").

Another argument presented by the Tribe is that it has satisfied the "sum certain" requirement because this claim was "stated in a manner which allows for reasonable determination of the recovery available at the time [was] presented." (Doc. 24 at 253) (quoting *Metric Constr. Co. v. United States*, 1 Cl. Ct. 383, 391 (1983)). A monetary CDA claim may be saved from a failure to identify a sum certain if a simple mathematical calculation or the contractor's documentary submission to the contracting officer would determine the amount of the claim. *Tambolina Servs., Inc. v. United States*, Civ. No. 14-478, 2015 WL 4053490, at *3 (Jul. 2, 2015); *see also N. Star Alaska Hous. Corp. v. United States*, 76 Fed.Cl. 158, 184 (2007) (stating that "this court has consistently interpreted the 'sum certain' requirement to include amounts in dispute that 'can be easily determined by a simple mathematical calculation or from the contractor's submission to the contracting officer.'"); *Modeer v. United States*, 68 Fed.Cl. 131, 137 (2005) ("The sum certain requirement is met if the contracting officer can determine the amount claimed by a simple mathematical calculation."), *aff'd*, 183 Fed.Appx. 975 (Fed. Cir. 2006)).

In examining the Tribe's September and November 2017 claims letters and the Tribe's fiscal year 2012 and 2013 Dispute Calculation and Information forms, the Court does not find that the Tribe provided the contracting officer with any dollar figure for third-party revenues that the Tribe believed should be included in the direct cost base and applied to the indirect cost rate. Neither does the Court find that the Tribe provided any dollar figure for lost third-party revenues. Accordingly, the Court concludes that the Tribe's claims based on third-party revenues could not be easily determined from a simple mathematical calculation. *See Exec. Court Reporters, Inc. v. United States*, 29 Fed.Cl. 769, 775 (1993) (stating that the "simple mathematical calculation" approach will not save a contractor's claim if the contractor has not included dollar figure in the claim submitted to the contractor officer); *see also Tambolina Servs., Inc.*, 2015 WL 4053490 at *4 ("Not only do [claimant's] April 2013 letters fail to provide the basis for any mathematical formula, they also fail to provide any indicators which would have informed Mr. Harris of the monetary amounts requested by [the claimant] under the CDA."). In addition, the Court finds that the Tribe did not specify to the contracting officer any other documents that provided a clear and unequivocal indication as to the amount sought by the Tribe on these claims. *See N. Star Alaska Hous. Corp. v. United States*, 76 Fed.Cl. 158, 185 (2007) (stating that administrative claims cannot "be cobbled together from various documents . . . possessed by defendant . . . [if] there are no select group of documents, supplied by plaintiff or otherwise, that provide a 'clear and unequivocal' indication as to the amount sought by plaintiff.").

In its brief in opposition to Defendants' Motion to Dismiss, the Tribe argues that with regard to the Tribe's fiscal year 2012-2013 claims, it provided, at the contracting officer's request, a document in support of the Claims Letters that included the amount of contract support costs owed on the Tribe's third-party program income. (Doc. 24 at 251). Specifically, the Tribe stated in its brief:

> The contracting officer responded to the Tribe's Claim with an acknowledgment of receipt under 41 U.S.C. § 7103(f)(2) and requested further information on "CSC that the Tribe actually incurred" to establish the additional amount of CSC the Tribe claims it is owed under the contract. Ex. 1 (Claims Acknowledgment Letters) at 1-2 (FY 11), 4-5 (FYs 12-13). After responding with additional data showing CSC incurred on the full base amount, including appropriated dollars and third-party program income, the contracting officer determined that the Tribe was not entitled to the relief sought under the contract, holding in part that "IHS met the Government's contractual responsibilities to the Tribe in FYs 2011-2013 by paying

the full amount of CSC incurred by the Tribe for those years . . . ." Compl. Ex. 4
at 6, ECF1-4.

(Doc. 24 at 261).   The additional documentation allegedly submitted by the Tribe to support its
third-party revenues claims was not initially part of the record on the Motion to Dismiss.   The
parties disputed whether, in determining whether the Tribe presented these claims to Indian Health
Service, the Court was precluded from considering such evidence under Federal Rules of Evidence
408.

Because a CDA claim may take the form of one or several documents, on September 15,
2021, the Court ordered the parties to file by stipulation, if possible, any documents to support its
claims based on third-party income that were submitted by the Tribe prior to IHS's final decision
denying the Tribe's claims.   The Court concluded that it was not precluded under Rule 408 from
considering this evidence in determining whether it had jurisdiction over the Tribe's claims. *See*
*Love v. Talbert House*, Civ. No. 19-0448, 2020 WL 6440256, at *2 (S.D. Ohio Nov. 3, 2020)
("Rule 408 does not prohibit the consideration of [statements made as part of settlement
negotiations] for other purposes; specifically, it does not prohibit their consideration to establish
that a plaintiff fulfilled administrative exhaustion requirements."); Weinstein's Federal Evidence
§ 408.08[9] ("Rule 408 does not prohibit evidence of a settlement when it is used either to establish
or to attack the court's jurisdiction").

Pursuant to the Court's Order, the Government filed an Unopposed Motion to File
Settlement Correspondence Under Seal.   On June 25, 2018, Jamie Whitelock, an attorney from the
Office of General Counsel with the Department of Health and Human Services responded on
behalf of Indian Health Service regarding the Tribe's claims. (Doc. 31-2 at 307).   On October 19,
2018, counsel for the Tribe responded by letter labeled "Rule 408 Privileged Communication" in
which it stated, among other things, that funding from third party revenues which were used to
provide services under the funding agreements, amounted "to an increase in the direct cost base of
$1,013,079, $635,269, and $874,248 for fiscal years 2011 through 2013, respectively."   The Tribe
stated that this third-party funding adds: (1) $841,226 in total to the Tribe's Claim 1 –
Underpayment of NBC Awarded Rate (Shortfall Claim) ($319,323 in FY 11; $210,147 in FY 12;
and $311,757 in FY 13);  (2) $21,559 total to Claim 5 – Failure to Pay Direct Contract Support
Costs ($8,658 in FY 11; $5,429 in FY 12; $7,472 in FY 13); (3) and $7,205 total to Claim 6 –
Failure to Pay Indirect Costs on Unpaid Direct Contract Support Costs.   The Tribe also noted that

after further analysis, its Claim 1 for fiscal year 2012 was decreased by $27,287 to $278,407. The Tribe concluded its October 19, 2018, letter by offering to the settle its claims for a designated amount.

On December 26, 2018, Ms. Whitelock responded by letter to the Tribe's October 19, 2018, settlement proposal in which it stated that the Tribe's "new claims for third-party funding based on *Navajo Health Foundation—Sage Memorial Hospital, Inc. v. Burwell*, 263 F.Supp.3d 1083 (D.N.M. Nov. 3, 2016) (*Sage*)" had not been presented to Indian Health Service. Ms. Whitelock stated on behalf of IHS that since the Tribe had not presented this argument as a proper claim to the contracting officer, the Agency could not consider this argument. (Doc. 31-2 at 320). The letter also indicated that claims for years prior to FY 2012 were time-barred.

The Tribe responded by letter dated February 1, 2019, arguing that its claim for "total contract costs" under the ISDEAA encompassed its claims based on a failure to include third-party dollars in the direct cost base. The Tribe argued that these were not new claims but rather was "additional evidence pertaining to damages springing from . . . [the] same factual claim[s]" for indirect and direct contract support cost shortfalls" and argued that the Tribe "is not precluded from changing the amount of the claim or producing additional data in support of increased damages." The Tribe also stated that even if this increase in damages were held to be a new claim, given IHS's litigation position and the recent mandate issued in *Sage*, equitable tolling would apply, as acknowledged by the Court of Federal Claims in *Al-Juthoor Contracting Co. v. United States*, 129 Fed.Cl. 599, 615 (2016). There is no evidence before the Court that the Tribe made any additional submissions to the contracting officer beyond its claims letters and Dispute Calculation and Information forms that were submitted in September and November 2017.

At the outset, the Court notes that the Tribe's claims to the contracting officer and the Tribe's settlement communications are completely devoid of a sum certain monetary claim[14] based

---

[14]    In its claims presented to the contracting officer for fiscal years 2011-2013, the Tribe claimed that it was owed $1,179,608 under its ISDEAA contracts. Even if the Court was to consider the additional dollar figures provided by the Tribe in settlement communications as amending the Tribe's claims, the sum total for the Tribe's claims would increase to $2,022,311 which is $361,758 less than the $2,384,069 in total damages claim the Tribe seeks to recover in its federal lawsuit. The majority of the discrepancy between the sum total of the claims presented to the contracting officer and the sum total of damages sought in this lawsuit is accounted for by the $349,657 in damages the Tribe alleges it suffered from lost third-party revenues.

on lost revenues. Because the Tribe has not met the sum certain jurisdictional requirement for its claim for lost third-party revenues, the Court lacks jurisdiction over this claim.

In addition, the Court concludes that Tribe's settlement communications regarding lost third-party revenues and regarding administrative costs paid on the third-party revenue-funded portion of the Tribe's operations do not constitute a valid claim or an amendment to the Tribe's claims. First, these figures were not "submitted to the contracting officer" for a decision, but were provided to Ms. Whitelock, an intermediary employed by the Office of General Counsel with the Department of Health and Human Services who was had been appointed by the Tribe to respond to the Tribe's claims in settlement negotiations. *See* 25 C.F.R. § 900.217(a) ("Before issuing a decision on a claim, the awarding official should consider using informal discussions between the parties, assisted by individuals who have not substantially participated in the matter, to aid in resolving differences."). It is the *receipt* of the claim which activates the contracting officer's obligations under the CDA. *Lakeview Const. Co. v. United States*, 21 Cl.Ct. 269, 276 (1990); 41 U.S.C. § 7103(f)(2) ("A contracting officer shall, within 60 days of *receipt* of a submitted certified claim over $100,000. . . ."). The Court acknowledges that courts have held that the term "submitted" in the CDA can embrace the idea of delivery through an intermediary. *Lakeview Const. Co.*, 21 Cl.Ct. at 276; *see also Am. Pacific Roofing Co. v. United States*, 21 Cl. Ct. 265, 268 (1990). However, as stated by the Court of Federal Claims in *Lakeview Construction Company*, "the critical issue is whether the claim reached the CO." *Id.* For example, in *American Roofing Co.*, the plaintiff entered into a roofing contract with the Navy to install new waterproofing on the roof at the Naval Postgraduate School. 21 Cl.Ct. at 266. After the roof allegedly continued to leak, the Navy directed the plaintiff to repair the leaks. *Id.* The plaintiff submitted a claim for repair costs to the Resident Officer in Charge of Construction (ROICC) pursuant to the terms of the contract and the claim requested a final decision from the CO. *Id.* Pursuant to Navy procedure, the ROICC forwarded the claims to the CO and the CO denied the plaintiff's claim. *Id.* The court held that it had jurisdiction over the plaintiff's claim because the plaintiff's contract advised it to direct all "requests for payment" to the ROICC and the claim document to the ROICC explicitly requested a final decision from the CO and had been forwarded to and received by the CO who rendered a final decision thereon. *See id.* at 268.

The court in *American Pacific Roofing* distinguished its decision in *West Coast General Corp. v. United States*, 19 Cl.Ct. 98 (1989) in which it held that the plaintiff's letters to the ROICC asserting that it had performed additional work did not constitute a "claim" under the CDA. The court found significant the fact that the letters in *West Coast* did not request a final decision by the CO, did not assert any specific basis for monetary relief, and did not contain the proper certification. *American Pac. Roofing*, 21 Cl.Ct. at 268 (citing *West Coast Gen. Corp.*, 19 Cl.Ct. at 99). The court stated that "[t]his ambiguous document could easily confuse a CO about 'what he is dealing with, and what he is expected to do.'" *Id.* (quoting *West Coast Gen. Corp.*, 19 Cl.Ct. at 101).

The Court finds that the facts of this case are more similar to those in *West Coast* rather than *American Pacific Roofing Co.* First, unlike in *American Roofing*, the Tribe has not indicated that any contractual provisions require submission of the Tribe's request for payment to any other individual or entity other than the contracting officer. Although the Tribe's settlement communications asserted that that the inclusion of third-party revenues in the direct cost base added $841,226 total to the Tribe's shortfall claim stated in Claim 1, $210,147 to the Tribe's claim for failure to pay direct contract support costs stated in Claim 5, and $7,250 to the Tribe's claim for failure to pay indirect costs on unpaid direct contract support costs stated in Claim 6, the Tribe did not state that it was seeking an amendment of these claims, nor did it request that these amounts be forwarded to the contracting officer for a final decision thereon. The Tribe simply referenced these additional sums to support its settlement proposal. *See Hoffman Constr. Co. v. United States*, 7 Cl.Ct. 518, 525 (1985) (stating that the letter expressed a "willingness to reach an agreement as opposed to a demand that the contracting officer reach a final decision."). The Tribe was informed by Ms. Whitelock that the Tribe's claims based on third-party revenues had not been presented as proper claims to the contracting officer for IHS and therefore that IHS could not consider these claims in its settlement negotiations, however the Tribe took no additional steps to submit a new claim or amend its claims before the contracting officer. Even if the Tribe had clearly indicated its intent in its settlement negotiations with the Department of Health and Human Services to assert a claim for lost third-party revenues and for unpaid contract support costs on the third-party revenue-funded portion of the Tribe's operations, the Tribe would bear the risk of non-transmission since there is no evidence that DHHS was designated by the Tribe's contract or by the contracting officer to receive the Tribe's CDA claims. *Lakeview Const. Co.*, 21 Cl.Ct. at 276

("If receipt by the CO is determinative, it is the contractor who must bear the risk of non-transmission of a claim if it uses an intermediary not designated by the contract, by regulation, or by the CO."); *see also Robin Indus., Inc., Tadcol Gov't Serv. Civ. v. United* States, 22 Cl.Ct. 448, 453 (1991) ("By addressing the letter to the DISC attorney, plaintiff bore the risk of non-transmission of the claim to the CO."); *Am. Pac. Roofing Co.*, 21 Cl.Ct. at 268 ("The contractor bears the risk for delayed or lost submissions prior to receipt by the CO.");.

Also of importance is the fact that the settlement communications by the Tribe did not meet the certification requirements for claims over $100,000. The Certification of claims of $100,000 is a jurisdictional prerequisite to suing in this Court under the CDA. *See CSX Trans., Inc. v. United States*, 123 Fed.Cl. 244, 250 (2015). The Federal Circuit had held that "the statutory mandate that all claims over [a specified amount] must be certified is one of the most significant provisions of the CDA." *Fidelity Const. Co. v. United States*, 700 F.2d 1379, 1384 (Fed. Cir. 1983), *superceded by statute on other grounds, Ardestani v. I.N.S.*, 502 U.S. 129 (1991). The purpose of certification is to facilitate settlements based upon a truthful submission of the contractor's costs. *Medina Constr., Ltd. v. United States*, 43 Fed. Cl. 537, 547 (1999). Certification discourages the submission of fraudulent or inflated claims by making contractors liable for fraudulent representation. *J & E Salvage Co. v. United States*, 37 Fed.Cl. 256, 263 n.6 (1997). Although a technically deficient certification neither prevents a contractor from stating a claim nor precludes the Court's jurisdiction over a claim, a "complete failure to provide a certification at all may not be deemed a defective certification." *Medina Const., Ltd.*, 43 Fed.Cl. at 547 (citing 48 C.F.R. § 33.201) ("Failure to certify shall not be deemed a defective certification.").

The Tribe's claim for unpaid contract support costs on the third-party revenue-funded portion of the Tribe's operations and the Tribe's claim for lost third-party revenues each exceed $100,000 and are therefore subject to the certification requirements of the CDA. In order for the Court to even consider the Tribe's settlement communications to be a claim or an amendment of their fiscal year 2012 and 2013 claims for unpaid contract support costs on the third-party revenue-funded portion of the Tribe's operations and the Tribe's claim for lost third-party revenues, it must be accompanied by a contemporaneous certification that makes all the assertions required by 41 U.S.C. § 7103(b). *See D.L. Braughler Co. v. West*, 127 F.3d 1476, 1483 (Fed. Cir. 1997). It is

clear from the Court's review of the Tribe's settlement communications that they did not contain even a technically deficient certification.

In sum, the Court concludes that the Tribe failed to submit to the contracting officer for a final decision its claims for lost third party revenues and for unpaid contract support costs on the third-party revenue-funded portion of the Tribe's operations. Accordingly, the Court concludes that it lacks jurisdiction over these claims whether they be based on a breach of contract or a breach of a statutory duty to pay contract support costs.

Accordingly, it is hereby ORDRED that Defendants' Motion to Dismiss (Doc. 15) is GRANTED IN PART and DENIED IN PART as follows:

1) GRANTED as to Claim II and III; the Court lacks jurisdiction over these claims and they are dismissed without prejudice; and

2) GRANTED IN PART AND DENIED IN PART as to Claim VI. The Court lacks jurisdiction over the Tribe's statutory violation claims for lost third-party revenues and for unpaid contract support costs on the third-party revenue-funded portion of the Tribe's operations and these claims are dismissed without prejudice. The Court has jurisdiction over the Tribe's remaining claims alleged in Claim VI.

Dated this 30\ day of September, 2021.

BY THE COURT:

Lawrence L. Piersol
United States District Judge

ATTEST:
MATTHEW W. THELEN, CLERK